# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

DARRYL HURD,            )
                               )
       Plaintiff,         )
                               )
     v.                   )    **Case number 4:07cv1484 TCM**
                               )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,   )
                               )
       Defendant.      )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Darryl Hurd for supplemental security income benefits ("SSI") under Title XVI of Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383b, is before the Court, see 28 U.S.C. § 636(c), for a final disposition. Mr. Hurd has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Darryl Hurd ("Plaintiff") applied for SSI in November 2005, alleging a disability as of October caused by paranoid schizophrenia, depression, back pain, and muscle spasms in both legs. (R. at 95-102.)[1] This application was denied initially and after a hearing held in February 2007 before Administrative Law Judge ("ALJ") Randolph E. Schum. (Id. at 13-29,

---

[1]References to "R." are to the administrative record filed by the Commissioner.

47, 51-58, 62-66.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 4-6.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Jeffrey Magrowski, Ph.D., testified at the administrative hearing.

Plaintiff testified that he was 40 years old.  (Id. at 15.)  He is 5 feet 11 inches and weighs 185 pounds.  (Id. at 19.)  He completed the tenth grade and got his General Equivalency Degree ("GED") in prison.  (Id. at 15.)  He has had no further formal education.  (Id. at 15-16.)

Plaintiff was in prison for six years for selling cocaine.  (Id. at 16.)  He had been selling drugs for less than one year before being charged.  (Id.)

He last worked as a dishwasher.  (Id.)  He has not worked since being released from prison, nor has he looked for work or been to vocational rehabilitation.  (Id. at 16-17.)  He has been seeing a counselor at Hopewell Clinic twice a week and a psychiatrist twice a month for schizophrenia.  (Id. at 17.)  He also participates in a twelve-step program at the Clinic for alcoholism and drug abuse.  (Id. at 21.)  The schizophrenia makes him hear voices and keeps him from working.  (Id. at 17.)  He began hearing voices when in prison.  (Id. at 21.)  The voices use profanity, call him names, and belittle him.  (Id.)  He tries to reason with them.  (Id.)  They argue with him and tell him to get into fights so he will be sent back to prison.  (Id. at 22.)  Medication, i.e., Navane and Cogentin, have lessened the voices but have

- 2 -

not made them stop or change in content.  (Id.)  The medication makes him sleepy.  (Id.)  Plaintiff cannot concentrate or focus on any one thing for any length of time. (Id. at 17.)

Plaintiff further testified that he has leg cramps or muscle spasms from his knees to his hips.  (Id. at 18.)  These occur at night, usually twice a week.  (Id.)  Once awake, it takes at least twenty minutes before he can go to sleep again.  (Id. at 19.)  Plaintiff also has problems with his back.  (Id. at 20.)  He cannot bend far over without pain.  (Id.)  His back has never been x-rayed.  (Id.)  When he went to the doctor, the doctor only gave him pain medication.  (Id.)  He is going to a clinic in two days to see a physician.  (Id.)

Plaintiff could think of no other problems that would prevent him from working.  (Id.)  He gets along "pretty good" with other people.  (Id. at 22.)

Plaintiff has no medical insurance.  (Id. at 23.)  He has no Medicaid card.  (Id.)

Since being released from prison, Plaintiff does not drink alcohol to an excess.  (Id. at 18.)  He drinks two beers a week.  (Id.)

The ALJ then questioned Dr. Magrowski, who testified as a vocational expert ("VE").

The ALJ asked him to assume a hypothetical person who could:

> Understand, remember, and carry out at least simple instructions and non-detailed tasks. . . .  Respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent.  Adapt to routine simple work changes, and take appropriate precautions to avoid hazards. . . .  [W]e have a hypothetical Claimant age 38, the alleged date of onset, with a GED. . . .  [A]ssume this hypothetical Claimant can perform a full range of medium work plus the psychological restrictions.  Would there be any examples of work this hypothetical Claimant could perform with those restrictions?

(Id. at 41.)  The VE replied that there were.  (Id. at 42.)  Specifically, there were jobs cleaning floors or taking out trash in an industrial setting.  (Id.)  There were also jobs as a hand launderer.  (Id.)  These jobs existed in significant numbers in the state and national economies.  (Id.)

Asked next to assume a person with the same psychological restrictions but capable of the full range of light work, the VE replied that there were housekeeping jobs and light packing jobs that such a person could perform.  (Id.)  These also existed in significant numbers in the state and national economies.  (Id.)

If the hypothetical person was seriously limited, but not precluded, in his ability to follow work rules; relate to coworkers; deal with the public; use judgment; interact with supervisors; deal with work-related stress; function independently; be attentive and concentrate; understand, remember, and carry out complex, detailed, or simple instructions; maintain personal appearance; behave in an emotionally-stable manner; relate predictably in social situations; and demonstrate reliability,[2] the above-mentioned jobs would not be available, primarily because a serious limitation in the ability to understand, remember, and carry out simple instructions would preclude even such unskilled work.  (Id. at 42-43.)  A combination of the limitations outlined above would produce an unreliable worker – one who could not maintain a schedule.  (Id. at 44.)  There are no jobs in the regional or national economy that such worker could perform.  (Id. at 44-45.)

---

[2]These limitations were taken from an assessment by Plaintiff's psychiatrist, Dr. Krojanker. See page 13, below.

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, records from the Missouri Department of Corrections ("DOC"), and reports of consultants.

Completing a disability report, Plaintiff listed his height as 5 feet 11 inches and his weight as 268 pounds.[3] (Id. at 120-26.) His impairments first bothered him on October 24, 2005, and stopped him from working that same day. (Id. at 121.) He had received medical treatment from the DOC from May 23, 2000, to September 21, 2005. (Id. at 123.) He had also been prescribed several medications for his schizophrenia and sleeplessness, including amitriptyline (the generic form of Elavil), benztropine (the generic form of Cogentin), and thiothixene (the generic form of Navane). (Id.) There were no side effects. (Id.) He had a back x-ray in 2000 and a blood test in August 2005. (Id. at 125.) He had completed the tenth grade, and was not in special education. (Id.)

A disability report was also completed by the "office of Robert Crowe [Plaintiff's attorney]" in March 2006 after the initial denial of Plaintiff's application. (Id. at 151-57.) There was no change in Plaintiff's condition. (Id. at 151.) He had been treated at the Hopewell Clinic for schizophrenia; his next appointment was in April. (Id. at 152.)

---

[3]Plaintiff explained at the hearing that his doctor had told him he had to lose weight.

On a function report completed by a friend of long-standing, it was reported that Plaintiff could no longer work or sleep like he formerly did. (Id. at 127-35.) He needed to be reminded to take care of his personal needs and grooming. (Id. at 129.) His only gardening chore was to rake leaves, and that took two hours. (Id.) He went for daily walks, but became "very tired" after one-half block. (Id. at 130, 132.) His one hobby was watching television. (Id. at 131.) He could pay attention for only one to two minutes. (Id. at 132.) He could follow spoken instructions; his friend did not know if he could follow written ones. (Id.) He got along well with authority figures and could handle changes in his routine. (Id.) He heard voices. (Id.)

Plaintiff's earnings statement reflect reported annual income in 1983 ($1.33), 1984 ($773.86), 1986 ($6.70), 1987 ($382.66), 1994 ($66.00), and 1999 ($72.00). (Id. at 104.)

Plaintiff was released on parole on September 21, 2005. (Id. at 114.) He had been sentenced in May 2000 to a ten-year term of imprisonment on a conviction for sale of a controlled substance, cocaine. (Id.) On a felony registration sheet completed two days before his release, "To be obtained" was written under the heading "Employment Information." (Id. at 116.)

Plaintiff's medical records before the ALJ began in 2005.

A DOC medication consent form dated August 22, 2005, listed three medications for Plaintiff: Elavil, Cogentin, and Navane. (Id. at 171.) He was taking each for schizophrenia, paranoid type. (Id.) A notation by Deja Suthirant, M.D., reads, "Based on my clinical findings, [Plaintiff] is disabled [and] qualified for medical assistance." (Id.)

The next medical record is of a consultative examination on January 31, 2006, by Elbert H. Cason, M.D. (Id. at 173-84). Dr. Cason noted that Plaintiff had last worked in 1987 as a dishwasher. (Id. at 173.) Plaintiff's chief complaint was low back pain and muscle spasms in both legs and thighs. (Id.) The low back pain he has had since he was a child. (Id.) The DOC doctor had told him he had something wrong with his back. (Id.) He was not currently under a doctor's care for his back. (Id.) He can lift no more than twenty-five pounds, walk no farther than four blocks, stand no longer than thirty minutes, and sit no longer than twenty minutes. (Id.) The muscle spasms happen at night, once or twice a week for five minutes each episode. (Id.) The spasms are "very, very painful." (Id.)

Plaintiff also reported that he lives with his five brothers. (Id.) He does some household chores. (Id.) He does not drive, but does get out of the house every day. (Id.) His weight was then 237 pounds. (Id. at 174.)

On examination, he had a decreased range of motion in his back with paravertebral lumbar area tenderness. (Id.) He could heel and toe walk and squat. (Id.) His gait was normal without an assistive device. (Id.) His back flexion and extension were limited to seventy degrees; lateral flexion was limited to ten degrees on the right and left. (Id.) Straight leg raises were ninety degrees on the right and left. (Id. at 175.) The strength of the major muscle groups in his lower extremities was normal. (Id.) He had a normal range of motion in his shoulder. (Id. at 177.) X-rays of his lumbar spine were normal. (Id. at 176.) He was alert and oriented to time, place, and person. (Id. at 174.) The diagnosis was chronic pain in his lower back. (Id. at 175.)

That same day, Plaintiff was evaluated by Georgia Jones, M.D. (Id. at 180-84.) Plaintiff reported that he saw a psychiatrist in prison and when he was first released. (Id. at 180.) He began hearing voices when he was 25 or 26 years old, and began using cocaine when he was in his 20s. (Id.) He hears voices every night since his release from prison. (Id. at 181.) He does not sleep well; he wakes up several times a night. (Id.) He has trouble focusing and concentrating. (Id.) He has two older brothers who are mentally retarded. (Id.) He was supposed to be daily taking Elavil, Navane, and Cogentin, but had run out of each. (Id.) He had not seen a psychiatrist for two months. (Id.)

During his evaluation, Plaintiff was able to laugh, interact appropriately, and complete tasks. (Id.) He focused on the conversation. (Id.) "There was no evidence of overt psychoses or responding to any kind of internal stimuli." (Id. at 181-82.) His "[a]ffect was euthymic and appropriately reactive." (Id. at 182.) There was "[n]o overt evidence of preoccupations, thought disturbances, perceptual distortions, delusion, hallucination, [or] suicidal or homicidal ideation." (Id.) Although he said he heard voices, there was no evidence of any response to internal stimuli. (Id.) His speech was reasonable in speed, quantity, and quality and was lacking in tangents, perseveration, or flight of ideas. (Id.) The diagnosis was psychotic disorder, not otherwise specified, and personality disorder, not otherwise specified. (Id. at 183.) His Global Assessment of Functioning score ("GAF") was 75.[4] (Id.)

_____

[4]"According to the [Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)], the Global Assessment of Functioning Scale is used to report 'the clinician's

Plaintiff first sought medical care from the Hopewell Clinic on March 26, 2006. (Id. at 245-54.) He was assessed by Charles Acolakse, a social worker and qualified mental health professional ("QMHP"). His complaints were that he heard voices, saw shadows, and could not concentrate. (Id. at 246.) His mental illness dated back to 1966, but he had not received any treatment until 1999. (Id.) He was on medication when he was released from the DOC in September 2005; however, he did not get the medication refilled after it ran out. (Id.) He reported that he had finished the 11th grade and had had no problems in school. (Id. at 247.) He had no existing physical medical problems. (Id. at 248.) He stayed at home and helped his brothers. (Id.) He wanted to work. (Id.) On examination, he appeared calm and cooperative. (Id. at 249.) He had a normal flow of thought. (Id.) His complaints were of difficulty falling asleep, of hearing voices that woke him up, and of seeing shadows that disappeared. (Id.) He had no thought of harming himself. (Id.) He did not drink and did not use drugs. (Id.) He was alert and oriented to time, place, and person. (Id. at 250.) He did have days when he could not concentrate or recall recent events. (Id.) The primary diagnosis was schizophrenic psychosis. (Id. at 251.) His GAF was 40.[5] (Id.) A history of poor compliance with treatment was listed as a risk. (Id.)

---

judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). A GAF of 75 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." Diagnostic Manual at 34.

[5]A GAF of 40 represents "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." Diagnostic Manual at 34.

Plaintiff returned the next month for counseling. (Id. at 243.) He reported that he was not doing well and was unable to sleep. (Id.) He heard voices night and day and saw shadows. (Id.) He had thoughts of harming himself, but did not. (Id.) He had been out of medication since February. (Id.) He has a history of drinking, but had been sober for eight years. (Id.) He was advised to return when a psychiatrist was available. (Id.)

Plaintiff did return. On May 12, he was assessed during a one-hour session by a psychiatrist, Rolf Krojanker, M.D., with the Hopewell Clinic. (Id. at 235, 241[6].) Plaintiff reported that he had been diagnosed as a paranoid schizophrenic seven years earlier. (Id. at 241.) He slept "reasonably well," but heard voices all day that called him names and kept him from working. (Id.) At bedtime, he saw dark shadows of people standing around. (Id.) He had run out of his medication the month before. (Id.) The diagnosis was schizophrenia, chronic, undifferentiated type. (Id.) Dr. Krojanker posited that Plaintiff might have a low IQ. (Id.) His GAF was 30.[7] (Id.) He was to return in two months. (Id.)

Plaintiff missed his July visit. (Id. at 239.) He saw Dr. Krojanker again on August 16. (Id. at 234, 240.) He reported during the fifteen-minute session that the medication kept him calm, but the voices persisted. (Id. at 240.) Dr. Krojanker opined that the voices might

---

[6]Citations to Dr. Krojanker's records include at least two page references. The lowest number is the citation to his illegible handwritten notes. The higher number(s) is to the transcribed copy of his notes.

[7]A GAF of 30 reflects that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." Diagnostic Manual at 34.

be memories from preliterate childhood that want to be recognized. (Id.) Plaintiff also reported that he could now clean up his house, but his lower back hurt. (Id.) Dr. Krojanker described Plaintiff as "pleasantly helpful, but confused at times." (Id.) If he had sufficient medication, Plaintiff need not return for two and one-half months. (Id.)

Plaintiff returned on October 23 for a fifteen-minute session. (Id. at 232, 239.) He had been taking his medication "fairly regularly." (Id.) The voices continued to curse him. (Id.) He was alert and oriented to time, place, and person. (Id.) He was attending Bible classes two or three times a week. (Id.) He had medication left over from his last visit. (Id.) His prescriptions were refilled, and he was to return in two months. (Id.) Plaintiff briefly saw Dr. Krojanker on October 25. (Id. at 233.) The doctor's notes do not indicate any treatment or include any observations of or by Plaintiff. (Id.)

On November 11, Plaintiff went to the emergency room at Barnes Jewish Hospital with complaints of pain caused by a herniated disc that he had had for years. (Id. at 200-07.) On examination by Elizabeth Hilliker, M.D., he was alert and oriented to time, place, and person and was able to move all his extremities well. (Id. at 203.) He was prescribed ibuprofen and cyclobenzaprine, a muscle relaxant, and discharged home with instructions to follow up at the clinic. (Id. at 206.)

Plaintiff returned to the emergency room on December 12, again complaining of low back pain for the past seven to eight years after an injury weight-lifting. (Id. at 208-13.) The pain was getting worse; there had been no new injury. (Id. at 211.) Straight leg raises were negative, and he had a normal range of motion in his hips and knees. (Id. at 210.) He was

able to move his extremities well.  (Id. at 212.)  Plaintiff also complained of shortness of breath and a cough.  (Id. at 211.)  He requested x-rays of his spine.  (Id.)  He was given pain medication and discharged home.  (Id. at 212, 213.)

Plaintiff missed his December 2006 and January 2007 appointments with Dr. Krojanker.  (Id. at 225.)

On January 28, 2007, Plaintiff went to the emergency room with complaints of back pain and a productive cough.  (Id. at 214-20.)  He explained that he had been working around his house, had fallen, and had then felt pain in his back.  (Id. at 217.)  He also reported that he had injured himself the year before lifting weight.  (Id.)  He rated his back pain, described as aching, as a seven on a ten-point scale.  (Id.)  As before, he had come by bus.  (Id. at 203, 211, 217.)  He felt some pain relief with ibuprofen.  (Id. at 217.)  The diagnoses were a strain of his lumbar spine and bronchitis.  (Id. at 218.)  He was discharged home with instructions not to lift anything heavier than ten pounds for five days.  (Id. at 219.)

Plaintiff was a walk-in patient for Dr. Krojanker on February 7.  (Id. at 231, 237.)  He reported his last use of cocaine was in December; he drank two beers a day.  (Id.)  He was oriented times two.  (Id.)  His medication was reissued.  (Id.)  Dr. Krojanker questioned whether a diagnosis of schizophrenia, chronic undifferentiated type was not a more valid diagnosis than that of paranoid schizophrenia.  (Id.)  He opined that Plaintiff should go to "N.A."  (Id.)  The session lasted twenty minutes.  (Id. at 237.)

That same day, Dr. Krojanker completed a questionnaire for Plaintiff and a Medical Assessment of Ability to Do Work-Related Activities (Mental).  (Id. at 222-23.)  In his

opinion, Plaintiff's condition – a schizoaffective disorder – was severe enough to prevent him from working as of 2006. (Id. at 222.) This condition also resulted in seriously limited, but not precluded, abilities to follow work rules; relate to coworkers; deal with the public; use his judgment; interact with supervisors; deal with work-related stress; function independently; be attentive and concentrate; understand, remember, and carry out complex, detailed, or simple instructions; maintain his personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. (Id. at 223.) Dr. Krojanker did not complete that portion of the form that requested he list the medical findings that supported his assessment. (Id.)

The ALJ wrote Dr. Krojanker on February 22, requesting "medical records, a new report, or a more detailed report" to support his conclusions in his assessment. (Id. at 91.) The ALJ noted that his request was based on apparent conflicts between the assessment and the medical evidence; the lack of necessary information; the apparent lack of medically acceptable clinical and laboratory diagnostic techniques; and the apparent lack of any information about what Plaintiff could do regardless of his impairment. (Id.) There is no reply in the record to this request.

The ALJ also had before him a Psychiatric Review Technique form completed by Sherry Bassi, Ph.D., a nonexamining consultant, in February 2006. (Id. at 185-98.) Plaintiff's impairment, a psychotic disorder, was classified as not severe. (Id. at 185, 187.) This disorder resulted in mild restrictions of daily living activities, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration,

persistence, or pace. (Id. at 195.) It did not result in any episodes of decompensation of any extended duration. (Id.) Dr. Bassi noted that there was no evidence of persistent psychosis. (Id. at 187.)

## The ALJ's Decision

Following the Commissioner's five-step sequential evaluation process, see pages 16 to 20, below, the ALJ first found that Plaintiff had not engaged in substantial gainful activity after the alleged onset date. (Id. at 51, 57.) The ALJ next found that Plaintiff had schizophrenia, but did not have an impairment or combination thereof which met or medically equaled an impairment of listing-level severity. (Id.)

The ALJ then summarized the medical evidence and Plaintiff's testimony. (Id. at 52-54.) The ALJ concluded that, with the exception of a few brief emergency room visits, there was no documentation of any significant treatment of Plaintiff's back. (Id.) There was documentation indicating that Plaintiff was frequently without prescribed medication. (Id.) With the exception of Dr. Krojanker, no health care provider had found or imposed any significant, long term limitations on Plaintiff's functional capacity. (Id.) There were no records indicating that any treating physician recommended that Plaintiff stop work as of his alleged disability onset date. (Id. at 55.) Indeed, there were no medical records indicating that the symptoms were present and uncontrolled on that date. (Id.) Dr. Krojanker's opinion was not persuasive because (a) his treatment notes never suggested that Plaintiff was unable to work or even addressed that issue; (b) it was inconsistent with that of other examining physicians and Dr. Bassi; (c) it was prepared at the request of Plaintiff's attorney and not in

the course of treatment; and (d) Dr. Krojanker never responded to the ALJ's request for clarification.  (Id.)

The ALJ further found that Plaintiff's descriptions of his symptoms and functional limitations were not credible.  (Id.)  At best, the record established that Plaintiff could not understand, remember, or carry out more than simple instructions.  (Id.)  His non-exertional limitations did not significantly compromise the range of medium work he could perform.[8] (Id.)

Because Plaintiff had no past relevant work, the Commissioner had the burden of showing that there was other work in the national or local economies that Plaintiff could perform consistent with his age, education, work experience, and functional limitations.  (Id. at 56.)  The evidence of Dr. Magrowski carried this burden.  (Id.)  Accordingly, Plaintiff was not disabled within the meaning of the Act.  (Id. at 57.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his

---

[8]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, . . . he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c).

previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920. "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez v. Barnhart**, 292 F.3d 576, 580-81 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) a

claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. <u>Id.</u> § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. <u>Id.</u> §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each

area imposed by the mental impairment. <u>Id.</u> §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." <u>Id.</u> § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." <u>Id.</u> A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. <u>Id.</u> § 416.920a(d)(1).

The burden at step four remains with the claimant. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824; 20 C.F.R. § 416.920(f). The Commissioner may meet his burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a

preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (internal quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).

## Discussion

Plaintiff argues that the ALJ erred by proffering evidence obtained after the hearing, thereby violating his due process rights, and by failing to properly assess his residual functional capacity.

The evidence not offered is the ALJ's letter to Dr. Krojanker and the ALJ's consideration of the lack of response by Dr. Krojanker as a negative factor in deciding what weight to give the doctor's statement.  Plaintiff also notes that the zip code on the ALJ's letter

is incorrect.  Both parties note that there is no indication in the file that the letter was returned.

"Procedural due process under the Fifth Amendment requires that disability claimants be provided a 'full and fair hearing.'"  **Passmore v. Astrue**, 533 F.3d 658, 663 (8th Cir. 2008) (quoting Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2008)).

> [T]o determine whether the process afforded is sufficient under the due process clause, courts must balance [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**Id.** at 664 (second alteration in original) (internal quotations omitted).  Although "[s]ocial security disability hearings are non-adversarial proceedings and therefore do not require full courtroom procedures," **Hepp**, 511 F.3d at 804, due process requires that a claimant be "given a meaningful opportunity to present [his] case," **Mathews v. Eldridge**, 424 U.S. 319, 349 (1976).

Citing 20 C.F.R. § 404.916(f), Plaintiff argues that he was denied such an opportunity.  Section 404.916(f) provides that a claimant be (i) notified in writing of any additional evidence that is obtained or developed after a hearing before a disability hearing officer if that evidence could support an adverse decision and (ii) given an opportunity to review and comment on the evidence.  As noted by the Commissioner, this section governs claims for disability insurance benefits, see 42 U.S.C. §§ 401-433, and hearings before a

disability hearing officer, not an ALJ. Moreover, as also noted by the Commissioner, the Eighth Circuit Court of Appeals held in **Filipi v. Chater**, No. 94-3583, 1995 WL 276401, *2 (8th Cir. 1995) (per curiam), that 20 C.F.R. § 404.916 applied to the reconsideration stage and not to an initial hearing. The claimant in that case was unrepresented at the administrative hearing and argued that the regulations required that the ALJ solicit her comments about post-hearing medical evidence. The court found the argument unavailing. **Id.**

The Eighth Circuit also rejected a due process claim in **Efinchuk v. Astrue**, 480 F.3d 846, 848-49 (8th Cir. 2007), when "[n]othing about the proceedings (1) indicate[d] the ALJ could not render a fair judgment, (2) show[ed] the procedural safeguards were constitutionally inadequate, or (3) shock[ed] the conscience." The proceedings now at issue reveal a similar lack.

The ALJ was required "to give reasons for giving weight to or rejecting the statements of a treating physician." **Hamilton v. Astrue**, 518 F.3d 607, 610 (8th Cir. 2008). The medical records of Dr. Krojanker begin on May 12, 2006. The next visit is in August. There is one substantive visit in October. The next is in February. After approximately two hours of sessions with Plaintiff over a ten-month period, Dr. Krojanker assessed Plaintiff as being unable to work. These assessment was made in response to questions posed by Plaintiff's attorneys and was not supported by any contemporaneous observations by Dr. Krojanker in his notes or by any tests or other diagnostic criteria. Indeed, the only consistent symptom

of an illness noted by Dr. Krojanker was Plaintiff's report of hearing voices, and the voices lessened when Plaintiff was compliant with his medication. The lack of a response by Dr. Krojanker to the ALJ's letter was but one of four factors the ALJ considered when deciding what weight to give his assessment of Plaintiff. Moreover, Plaintiff had a safeguard in place. He requested review of the ALJ's decision by the Appeals Council within the allowed sixty-day period; he could also have submitted a reply by Dr. Krojanker or a statement that the ALJ's letter was never received. He did not. See **Hepp**, 511 F.3d at 805 ("[D]ue process is not violated in social security disability hearings when the claimant fails to exercise the procedural safeguards that would have addressed his concerns.").

Nor does the ALJ's reference to a lack of response by Dr. Krojanker shock the conscience. As discussed above, the ALJ gave other reasons supported by the record for not giving Dr. Krojanker's report persuasive weight.

For the foregoing reasons, the ALJ did not violate Plaintiff's due process rights when citing Dr. Krojanker's lack of response to his letter. Cf. **Goad v. Barnhart**, 398 F.3d 1021, 1025 (8th Cir. 2005) (reversing Commissioner's adverse decision and remanding case in which Commissioner had improper ex parte communication with court on why claimant had withdrawn remanded claim, such communication having been relied on by court for denial of attorney's fees to claimant's lawyer); **Patrick ex rel. D.L.H. v. Barnhart**, No. 4:05cv1975 ERW(LMB), 2007 WL 5110322, *14 (E.D. Mo. 2007) (finding ALJ violated claimant's due process rights by, when evaluating claimant's credibility, relying, in part, on evidence of

building guard about claimant's behavior when waiting for hearing to begin; ALJ had failed to give claimant an opportunity to cross-examine guard, whose testimony claimant alleged was false).

Plaintiff also argues that the ALJ failed to properly assess his RFC. Specifically, although the ALJ had the statements of Drs. Krojanker and Suthirant that Plaintiff was disabled and of Drs. Jones and Bassi that he was not, he rejected all when assessing Plaintiff's RFC. The opinion of Dr. Krojanker, Plaintiff's treating physician, should have been given the most weight. And, the ALJ's reference to that opinion not being prepared in the course of treatment applied equally to the opinions of Dr. Jones.

"'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in original); accord **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005); **Reed v. Barnhart**, 399 F.3d 917, 920 (8th Cir. 2005). "Merely concluding that a particular physician is a treating physician . . . is not the end of the inquiry." **Stormo v. Barnhart**, 377 F.3d 801, 805 (8th Cir. 2004). The longer a claimant's health care provider has treated him and the more times, the more weight is given to that provider's opinion. 20 C.F.R. § 416.927(d)(2)(i).

Dr. Krojanker treated Plaintiff four times[9] for a total of one hour and fifty minutes. He did not begin treating him for seven months after his alleged onset date and four months after Plaintiff was evaluated by Dr. Jones. His treatment notes do not include any observations by him supportive of Plaintiff's claims; indeed, the only observation Dr. Krojanker makes is that Plaintiff was "pleasantly helpful, but confused at times." (R. at 240.) That portion of the questionnaire completed by Dr. Krojanker in February asking that he list his medical findings to support his opinion that Plaintiff was disabled was blank. Additionally, Dr. Krojanker's notes reflect poor compliance by Plaintiff with taking his medication and keeping his appointments.

"[A] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." **Hamilton v. Astrue**, 518 F.3d 607, 610 (8th Cir. 2008). See also **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007) (finding that "ALJ acted within the acceptable zone of choice" when declining to give treating physician's RFC assessment controlling weight; treatment visits were infrequent and less than expected given claimant's allegations, and opinion was not supported by any clinical or laboratory diagnostic data); **Randolph v. Barnhart**, 386 F.3d 835, 839 (8th Cir. 2004) (finding that ALJ had not erred by discrediting opinions and findings of claimant's treating physician; treating physician completed checklist that mirrored mental impairment's listing, her treatment notes did not indicate she had sufficient knowledge on which to base her conclusion that claimant

[9]The second October visit was clearly not for treatment.

could not work, and she never asked claimant about his abilities to function in areas in which she concluded he could not); **Strongson**, 361 F.3d at 1071 (holding that it was reasonable for ALJ to give little probative value to treating physician's conclusory statement that claimant was vocationally impaired when such statement was without explanation and was not consistent with physician's treatment notes). The ALJ did not err when not giving Dr. Krojanker's conclusory opinions no weight.

**Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  15th  day of September, 2008.